IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SUSAN HYLTON,

       Plaintiff,

v.                                No.

BOARD OF COUNTY COMMISSIONERS FOR
THE COUNTY OF DOÑA ANA, TIARA GAMBOA,
AURORA TERRAZAS, and VICKI HOOSER,

       Defendants.

**COMPLAINT FOR THE RECOVERY OF DAMAGES CAUSED BY THE
DEPRIVATION OF CIVIL RIGHTS**

Plaintiff brings this complaint for damages caused by the violation of Plaintiff Susan Hylton's civil and constitutional rights.  Plaintiff files this complaint under the Federal Civil Rights Act and the Constitution of the United States.  In support of this Complaint, Plaintiff alleges the following:

**JURISDICTION AND VENUE**

1. Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983 and 1988.  Venue is proper as the acts complained of occurred exclusively within Doña Ana County, New Mexico.

**PARTIES**

2. Plaintiff Susan Hylton is an individual and resident of Doña Ana County, New Mexico.

3. At the time of filing, Susan is not in custody.

4. Defendant Board of County Commissioners for the County of Doña Ana ("Board") is a governmental entity within the State of New Mexico and a "person" under 43 U.S.C. §

1

1983. At all times material to this Complaint the Board was the employer of the individual defendants.

5.  Defendant Vicki Hooser was the administrator of the Doña Ana County Detention Center (hereinafter "DACDC") at all material times.

6.  Defendant Vicki Hooser is sued in her individual and official capacities.

7.  Defendant Tiara Gamboa was a high-ranking guard with supervisory authority at DACDC at all material times.

8.  Defendant Tiara Gamboa is sued in her individual capacity only.

9.  Defendant Aurora Terrazas was a correctional officer at DACDC at all material times.

10. Defendant Terrazas is sued in her individual capacity only.

## FACTUAL BACKGROUND

11. Susan Hylton was housed at DACDC as a pretrial detainee between September 17, 2018 and January 11, 2019.

12. On the day she arrived at the facility, Susan was given a copy of DACDC's Statement of Protection from Sexual and Physical Abuse and PREA Acknowledgment.

13. Susan was informed by DACDC staff that she had the right to be protected from harassment from staff.

14. She was also told, should she experience harassment, she had "the right and the responsibility to report the incident immediately to staff."

15. Susan was also provided a copy of a brochure "with details pertaining to the Prison Rape Elimination Act or PREA," which included information on how to "detect, prevent, and report sexual abuse/harassment."

16. The facility also regularly broadcasted PREA information in the female housing area via a television monitor.

17. On October 17, 2018, a female detainee at DACDC was thought to have used methamphetamines.

18. In response, Defendant Gamboa instructed DACDC staff to conduct a "shakedown" of the female pod.

19. All female inmates were moved into the dayroom to await individual searches.

20. Several inmates, including Susan, were subjected to visual strip searches by Defendant Gamboa.

21. These visual searches included searches of their breasts and genitals.

22. Defendants Gamboa and Terrazas conducted these strip searches in the shower areas of the female restroom.

23. A small shower curtain hung in front of the shower area, which failed to fully conceal the showers and the women in them.

24. The shower curtain opens directly into the female cells E-19 and E-20.

25. The location of the shower makes it possible for any passersby to view women while in the shower.

26. At the time of the strip searches, several (at least four) male officers were conducting cell searches and were able to see into the shower area.

27. Susan and another female inmate, Devon Velasquez were brought into the shower area by Defendants Gamboa and Terrazas for strip searches.

28. Defendant Gamboa instructed both Susan and Devon to remove their clothing for visual strip searches.

29. Defendant Gamboa and Defendant Terrazas conducted the searches of Devon and Susan.

30. Susan and Devon were stood next to each other, shoulder to shoulder.

31. As a result, Susan and Devon were able to see each other during this search.

32. At the time of the search, both Devon and Susan were on their periods.

33. DACDC limits the number of menstrual pads women receive during their cycle.

34. For many women, the number of pads provided by detention staff is insufficient to accommodate their menstrual flow.

35. As a result, it has become common practice for women housed at DACDC to create homemade tampons to wear in addition to menstrual pads.

36. Both Susan and Devon were on their periods at the time of the search and were wearing homemade tampons.

37. After they removed their clothing, Susan and Devon were asked to remove their tampons in front of Defendants Gamboa and Terrazas and each other.

38. Susan asked Defendant Gamboa if she could throw her tampon in the trash can.

39. Defendant Gamboa yelled at Susan, "No, throw it [the tampon] on the ground!"

40. Susan was forced to remove her homemade tampon in front of Defendant Terrazas, Defendant Gamboa, and Devon Velasquez.

41. Defendant Gamboa then asked Susan to spread her butt-cheeks, squat, and cough.

42. Upon information and belief, Defendant Gamboa instructed Susan to squat and cough approximately 13 times.

43. Each time Susan squatted and coughed, Defendant Gamboa told her to "cough harder."

44. Because Susan was on her period, each time Susan coughed, blood came out of her vagina.

45. During this search, Susan was able to see male guards through an opening facing the shower area.

46. Male officers were also able to see Susan during her strip search if they had wanted to.

47. While Susan and Devon were strip searched, several male officers searched cells E-19 and E-20.

48. Cells E-19 and E-20 are directly across from the shower.

49. According to video footage, one male officer passed the shower area several times while Susan and Devon were being strip searched.

50. The footage revealed male officers were able to see female inmates, including Susan, past the shower curtain during these searches.

51. Susan felt humiliated knowing male officers were able to hear her as she was instructed to remove her tampon, hear her coughing while bent over, and see her while she was naked performing these tasks.

52. Susan was humiliated having to undress and remove her homemade tampon in front of a fellow inmate.

53. Despite this invasive search, no contraband was found by any officers in any cells or on any inmates, including Susan.

54. Susan was eventually allowed to dress and exit the shower area.

55. After the search, Susan complained to Defendant Gamboa about the simultaneous strip search.

56. In response, Defendant Gamboa told Susan she was "just trying to get it [the search] done quickly."

57. Susan was taken to medical after the search where she spoke with Sgt. Segura.

58. Susan explained to Sgt. Segura what had happened to her.

59. Sgt. Segura then spoke with Defendant Gamboa about the nature of the strip searches she conducted on Susan and the other women in the pod.

60. Defendant Gamboa asked Susan why she told Sgt. Segura about the search.

61. In response, Susan asked Defendant Gamboa for the number to the PREA coordinator.

62. Defendant Gamboa would not allow Susan to use the phone to contact a PREA coordinator.

63. PREA coordinators record and investigate inmate complaints of sexual misconduct, prohibited by the Prison Rape Elimination Act (PREA).

64. Defendant Gamboa asked Susan why she needed to talk to PREA.

65. Susan refused to discuss her complaints with Sgt. Gamboa and again asked her for the number to PREA.

66. Defendant Gamboa denied Susan's request.

67. Defendant Gamboa learned Susan wished to file a PREA complaint against her.

68. Defendant Gamboa created a report indicating she learned of the PREA allegation against her.

69. One minute later, Defendant Gamboa created a report placing Susan in pre-disciplinary segregation in Fox Unit.

70. Susan was immediately moved to segregation.

71. Later that afternoon, Defendant Gamboa went to speak with Susan again, this time in her cell.

72. Susan asked Defendant Gamboa a third time to speak with a PREA officer.

73. Defendant Gamboa asked Susan, "Can't we just work this out?" and continued to deny Susan's request to speak with a PREA coordinator.

74. Instead of arranging for Susan to make her PREA complaint, Defendant Gamboa ensured Susan was placed in isolation.

75. Jail records show Susan was placed on 5-day segregation.

76. However, Susan was not released from the segregation pod until she was released from the facility on January 11, 2019.

77. While she was in segregation, Susan was housed in a small cell with only a small window facing the hallway.

78. Susan was not able to see or hear anything while isolated in this cell.

79. Susan was often isolated continuously for 30 hours at a time, devoid of human interaction.

80. During the 85 days of her confinement, Susan was only allowed to go to commissary once per week and was unable to get books to read.

81. Susan is a vegetarian and would receive special trays marked clearly with her name to accommodate her diet.

82. Because she received a special tray, Susan's food was prepared individually and separate from the other trays for the facility.

83. After her move to segregation Susan received burnt food for nearly every meal.

84. As a result, Susan lost approximately twenty (20) pounds while she was in segregation.

85. Susan frequently complained to officers and formally grieved the fact she was receiving burnt food.

86. Officers would refuse to give her a new tray if her food was inedible, so Susan would go several meals at a time without eating.

87. Susan grieved her continued lockdown on December 14, 2018.

88. In her grievance, Susan stated she believed she had been moved to lockdown in retaliation of her PREA complaint against Defendant Gamboa.

89. Susan's grievances were ignored.

90. Susan would spend time in her cell crying because of the torturous conditions she was subjected to.

91. On December 14, 2018, Susan told staff she was "very depressed and [had] fear everyday [sic] that they will purposely leave me back here."

92. Susan was ignored by facility staff and no response was ever given to Susan's grievances.

93. Susan was offered one hour of outdoor recreation Tuesdays, Thursdays, and Saturdays.

94. If Susan chose to go to outdoor recreation, she was not given a coat.

95. Because Susan was in segregation between October and January, it was too cold outside to go to recreation without a coat.

96. On December 26, 2018, Susan grieved the unprofessional behavior of Defendant Terrazas.

97. Susan asked Defendant Terrazas if she could be moved to another cell because the hot water in her cell did not work.

98. Defendant Terrazas laughed in Susan's face.

99. Defendant Gamboa was the sergeant on duty at that time.

100.    Susan was not moved to a cell with working hot water.

101.    Susan also received no response to her grievance about Defendant Terrazas's unprofessional conduct.

102.    On January 2, 2019, Susan ran out of toilet paper in her cell.

103.    She repeatedly asked the officer on duty for another roll of toilet paper but was refused.

104.    This officer told Susan the facility ran out of toilet paper and did not have any to give her.

105.    Because she had no toilet paper, Susan was forced to wipe herself with a hand towel after using the restroom.

106.    As a result, Susan was forced to live with a hand towel contaminated with her own bodily fluids.

107.    This was unsanitary and humiliating for Susan.

108.    Susan frequently grieved her conditions but received no response.

109.    Susan was finally released from DACDC on January 11, 2019.

110.    On that date, all of Susan's unanswered grievances were closed and marked "unable to be answered as the individual has been released from our custody."

111.    DACDC staff deliberately ignored Susan's complaints for months until she was finally released.

**COUNT I: UNREASONABLE SEARCH AND VIOLATION OF THE RIGHT TO BODILY PRIVACY UNDER THE FOURTEENTH AND/OR EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION**
**(Defendants Gamboa and Terrazas)**

112.    Plaintiff restates each of the preceding allegations as it fully stated herein.

113.     Susan had a right to be free from unreasonable and humiliating searches during her detention at DACDC.

114.     This right includes Susan's right to bodily privacy.

115.     Susan had a right to be free from strip and cavity searches in view of male detention officers.

116.     The manner in which Susan was searched was unnecessarily humiliating and degrading.

117.     Susan could see male officers walking past the curtain as she was forced to undress.

118.     After she undressed, Defendant Gamboa told Susan to remove her tampon from her vagina and throw it onto the ground.

119.     Male officers could hear Defendant Gamboa tell Susan to remove her tampon and throw it on the ground.

120.     Not only was Susan naked while male officers passed her, she was asked to turn around, squat, and cough during the search.

121.     As a result, Susan was forced to expose her genitals to male officers passing the shower while they conducted their searches of the pod.

122.     Each time Susan was asked to squat and cough, Defendant Gamboa asked her to "cough harder."

123.     Because Defendant Gamboa was not satisfied with Susan's coughs, she asked her to repeat this humiliating and degrading procedure several times.

124.     Susan was on her period at the time of this search.

125.     Each time Susan coughed, blood came out of her vagina.

126.     Male officers were able to hear and see the search conducted of Susan.

127.     Not only were male officers able to see Susan during this humiliating search, Susan was searched in front of another inmate.

128.     Despite the extensive nature of the invasive searches conducted, no contraband was found.

129.     Defendants did not have adequate justification to strip search Susan.

130.     The manner in which this search was conducted was unreasonable, humiliating, and degrading.

131.     Defendant Terrazas had an obligation to intervene and stop this unreasonable search.

132.     Instead, Defendant Terrazas followed Gamboas's lead and strip-searched people two at a time.

133.     There was no legitimate penological interest in conducting this search in such a flagrantly humiliating manner and as such it amounted to punishment of a pretrial detainee in violation of the 14th Amendment.

134.     The Defendants are trained not to conduct strip searches in front of other inmates or male staff.

135.     Defendants Gamboa and Terrazas deliberately ignored their training and conducted a strip search designed to humiliate and degrade Susan.

136.     Defendants Gamboa and Terrazas's actions were not only constitutionally unreasonable pursuant to *Kingsely v. Hendrickson*, 135 S. Ct. 2466, 576 U.S. ___ (2015),

they were also undertaken in violation of their training and with deliberate indifference to the inmates' constitutional rights under the 14th Amendment.

137.    Susan's charges were eventually dismissed on December 31, 2018.

138.    Susan was also held pending a probation violation hearing until she was adjudicated on December 19, 2018 to credit for time served and referred to a drug treatment program.

139.    On January 11, 2019, Susan was released on her own recognizance with instructions to report to a drug treatment program.

140.    Susan was a pretrial detainee until at least December 19, 2018.

141.    If Susan is considered not to be a pretrial detainee at any point in her incarceration, the conduct and conditions she was subjected to also amount to a violation of the Eighth Amendment to the Constitution.

142.    As a direct and proximate cause of Defendants' actions, Susan suffered damages and injuries including but not limited to physical injuries, pain and suffering, and severe psychological and emotional distress.

### COUNT II: RETALIATION in VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION
### (Defendants Gamboa and Terrazas)

143.    Plaintiff restates each of the preceding allegations as if fully stated herein.

144.    Following the strip search, Susan told Defendant Gamboa she wanted to contact the PREA coordinator.

145.    PREA coordinators investigate sexual misconduct, harassment, and assaults in jails.

146.    Such misconduct and harassment include inmates being subjected to unlawful and degrading strip searches.

147.     Instead of arranging for a PREA interview, Defendant Gamboa asked Susan why she needed to call the PREA coordinator.

148.     Susan told Defendant Gamboa she did not want to discuss it with her and again asked to speak with the PREA coordinator.

149.     Defendant Gamboa refused to allow Susan to contact the PREA coordinator.

150.     In response, Defendant Gamboa told Susan she would be moving to segregation.

151.     When Susan asked why she was being moved to segregation, Defendant Gamboa told her, "Because I'm the sergeant on duty and I can."

152.     Susan was placed in segregation that afternoon.

153.     Susan asked why she was placed in segregation and was never given a reason.

154.     Later, Defendant Gamboa went to Susan's segregation cell and again asked her why she needed to talk to a PREA coordinator.

155.     Defendant Gamboa knew she would be the subject of Susan's PREA complaint.

156.     Defendant Gamboa asked Susan if they could "work this out" without her contacting PREA.

157.     Defendant Gamboa knew it was not acceptable to challenge a potential victim of sexual misconduct in this manner.

158.     Susan told Defendant Gamboa that she wanted to speak with PREA and did not want to discuss her concerns with her.

159.     Defendant Gamboa once again refused to allow Susan to contact a PREA coordinator.

160.     Eventually, Susan was able to report this incident to the PREA coordinator.

161.     Susan was not released from segregation until her release from DACDC on January 11, 2019.

162.     Susan was placed in segregation by Defendant Gamboa in retaliation for her PREA allegations against Gamboa and Terrazas.

163.     After making her PREA complaint, Susan was fed burnt, inedible food.

164.     Susan's tray was given to her day in and day out burnt and inedible.

165.     Susan frequently grieved about the inedible food she was provided.

166.     Staff refused to give Susan new trays when her meal was inedible.

167.     Prior to her PREA complaint, Susan's food tray did not contain burnt inedible food.

168.     Susan was also left in a cell without working hot water throughout the winter months.

169.     Defendant Terrazas knew of the unacceptable conditions Susan was being subjected to and responded by laughing as her.

170.     Defendant Gamboa was a supervisor who had a responsibility to ensure Susan's grievances were responded to and to ensure her conditions of confinement met contemporary standards of decency.

171.     Instead of disciplining Defendant Terrazas for her intimidating conduct, Defendant Gamboa actions encouraged staff to mistreat Susan.

172.     Defendant Gamboa and Terrazas's actions chill future reporting of sexual misconduct, harassment, and assaults at DACDC.

173.     Susan's placement in segregation, and the intolerable conditions of confinement she was subjected to, were in retaliation of her PREA complaint.

174.     This retaliation amounts to a violation of her First and Fourteenth Amendment

rights.

175.     As a direct and proximate cause of Defendants' actions, Susan suffered damages

and injuries including but not limited to pain and suffering, and severe psychological and

emotional distress.

### COUNT III: VIOLATION OF PROCEDURAL DUE PROCESS
### (Defendant Hooser in both her individual and official capacities
### and Defendant Gamboa)

176.     Plaintiff restates each of the preceding allegations as if fully stated herein.

177.     After Susan requested to speak to the PREA coordinator, Susan was moved to

segregation.

178.     When Susan asked why she was being moved to segregation she was not given a

reason.

179.     Susan was moved to the segregation unit of DACDC into a cell by herself.

180.     Susan was told she had been found guilty of disciplinary infractions and would be

in segregation for five (5) days.

181.     Susan was found guilty of these disciplinary infractions before she was made aware

of the allegations.

182.     Jail records reflect Susan was housed in disciplinary segregation on lockdown,

along with loss of canteen and visitation, for five (5) days.

183.     Susan never received a hearing before she was found guilty of disciplinary

infractions.

184.     Susan had no meaningful ability to appeal her housing after being found guilty.

185.    Although Susan was only supposed to be segregated for five (5) days, she remained in the disciplinary pod until her eventual release on January 11, 2019.

186.    Susan had a due process right to a periodic review of her classification.

187.    Between October 22, 2018 and January 11, 2019, Susan was housed in segregation without hearing or reassessment.

188.    The conditions Susan was subjected to were, on their face, punishing and atypical conditions of confinement.

189.    In placing Susan in segregation for such a long period of time without affording her a hearing, or periodic classification review, Defendants denied Susan procedural due process of law as guaranteed by the Fourteenth Amendment.

190.    After placing Susan in segregation Defendant Gamboa refused to answer her grievances or provide her with a hearing in violation of her procedural due process rights.

191.    Defendant Hooser, in her role as facility administrator, reviews all long-term placements in segregation including Susan's.

192.    Defendant Hooser allowed Susan to remain in segregation knowing she did not have any classification reviews and knowing there was no adequate justification for her atypical conditions of confinement.

193.    Defendant Hooser's failure to conduct periodic classification reviews of all individuals in segregation amounts to a custom and policy of allowing inmates to be segregated without adequate justification.

194.    This custom and policy, along with her individual failure to provide Susan with procedural due process, was the moving force behind the due process violations.

195.     Had Susan had adequate procedural due process she would not have been isolated

for such a long period of time and Defendant Gamboa would not have been able to retaliate

against Susan in violation of both her 14th and 1st Amendment rights.

### COUNT III: VIOLATION OF SUBSTANTIVE DUE PROCESS
### (All Defendants)

196.     Plaintiff restates each of the preceding allegations as if fully stated herein.

197.     Susan was housed in segregation between October 17, 2018 and January 11, 2019.

198.     Throughout her time in segregation, Susan was housed in a small cell on her own.

199.     While other cells in the segregation unit of DACDC had windows, Susan's cell had

only a small window in the door, facing the hallway.

200.     Susan was not able to see or hear anything while isolated in this cell.

201.     Susan was often isolated continuously for 30 hours at a time, devoid of human

interaction.

202.     As a matter of routine, Susan was isolated in her cell for 29 continuous hours then

allowed out of her cell to perform cleaning duties in the pod, then returned to her cell for

another 29 hours.

203.     During the 85 days of her confinement, Susan was only allowed to go to

commissary once per week and was unable to get books to read.

204.     Susan was only offered three hours of recreation per week.

205.     If Susan chose to go to outdoor recreation, she was not given a coat.

206.     Because Susan was in segregation between October and January, it was too cold

outside to go to recreation without a coat.

207.     Susan was housed in a cell without hot water.

208.    When Susan asked to be moved to a cell with working hot water, Defendant Terrazas laughed in her face.

209.    Susan was served food that was so burnt it was inedible at almost every meal.

210.    As a result, Susan lost approximately twenty (20) pounds.

211.    While she was in segregation, Susan ran out of toilet paper.

212.    When Susan asked for another roll of toilet paper, she was told the facility had run out and did not have another roll to give her.

213.    As a result, Susan was forced to wipe herself with a hand towel in her cell.

214.    This hand towel remained in her cell and made her conditions even more unsanitary.

215.    Susan would spend time in her cell crying because of the torturous conditions she was subjected to.

216.    Defendants knew Susan faced a substantial risk of serious mental or physical harm if his conditions of confinement did not meet contemporary standards of decency.

217.    Defendants acted with deliberate indifference to this risk.

218.    Susan's conditions of confinement, in combination with her humiliating strip search and retaliatory treatment, violated contemporary standards of decency and as such amounted to a substantive due process violation of the Fourteenth Amendment to the United States Constitution.

## **JURY DEMAND**

219.    Plaintiffs hereby demand a trial by jury on all counts.

WHEREFORE, Plaintiff requests judgment as follows:

1. Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including damages for attorney's fees and emotional harm.

2. Punitive damages in an as yet undetermined amount severally against the individually named Defendants.

3. Reasonable costs and attorney's fees incurred in bringing this action.

4. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

COYTE LAW P.C.

/s/ Matthew E.  Coyte
Matthew E. Coyte
Alyssa D. Quijano
Attorney for Plaintiffs
3800 Osuna Road NE, Suite 2
Albuquerque, NM 87109
(505) 244-3030