IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SUSAN HYLTON,

       Plaintiff,

vs.                                                                        Case No. 2:19-cv-01155-KWR-CG

BOARD OF COUNTY COMMISSIONERS FOR
THE COUNTY OF DONA ANA, TIARA GOMBOA,
AURORA TERRAZAS, and VICKI HOOSER,

       Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court upon Defendants Gamboa's and Terrazas' Motion for Summary Judgment on the Basis of Qualified Immunity as to Count I **(Doc. 54)**. Having reviewed the parties' pleadings and the applicable law, the Court finds that Defendants' motion is **WELL-TAKEN** and, therefore, is **GRANTED.**

### BACKGROUND

This case arises out of a detainee's visual body cavity search in the Doña Ana County Detention Center ("DACDC"). Plaintiff was detained in the DACDC pending a probation revocation hearing. Plaintiff asserts that Defendants Gamboa and Terrazas violated her constitutional rights during the visual body cavity search. Defendants Gamboa and Terrazas are female corrections officers at DACDC. Defendants assert that they received a report from an inmate that detainees in Cell 20 of pod Echo 3 possessed and was using methamphetamine. A detainee tested positive for methamphetamine. They subsequently began a search of the Echo 3 pod, and visually searched the detainees in Cell 20, including Plaintiff.

Plaintiff filed this case under 42 U.S.C. § 1983, alleging the following claims against the Defendants:

Count I:  Unreasonable Search and Violation of the Right to Bodily Privacy and the Fourteenth and/or Eighth Amendments (Defendants Gamboa and Terrazas in their individual capacities)**;**

Count II:  Retaliation in Violation of the First and Fourteenth Amendments (Defendants Gamboa and Terrazas in their individual capacities);

Count III:  Violations of Procedural Due Process (Defendant Hooser in her individual and official capacities and Defendant Gamboa in her individual capacity); and

Count IV:  Violation of Substantive Due Process (All Defendants)

In this motion for summary judgment Defendants Gamboa and Terrazas seek judgment on Count I.

## LEGAL STANDARD

A motion for summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). As the Tenth Circuit has explained, "mere assertions and conjecture are not enough to survive summary judgment." *York v. AT&T*, 95 F.3d 948, 955 (10th Cir. 1996).  To avoid summary judgment, a party "must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Co.*, 853 F.2d 768, 771-72 (10th Cir. 1988) (quotation marks and citations omitted).

"A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017) (quotation marks and citation omitted).

## UNDISPUTED MATERIAL FACTS

For the qualified immunity analysis, the Court generally considers Plaintiff's version of the facts that are supported in the record. Moreover, the Court considers the facts Plaintiff expressly admitted or did not genuinely dispute. To the extent a party's asserted facts do not contain citations to the record and are not otherwise expressly admitted by the opposing party, the Court disregards them.

### A. Reported drug use and shakedown of Echo 3 Pod.

Plaintiff was detained at the DACDC on September 17, 2018 for a probation violation with a hearing on December 19, 2018. Plaintiff was housed in cell 20 of the Echo 3 dayroom or pod. On October 16, 2018, Sgt. Claudia Renteria received a report from a detainee that there were drugs, or a white powdery substance, being snorted in the bathroom by detainees in Cell 20.

Sgt. Renteria walked through the Echo 3 pod and noticed that Plaintiff's cellmate was acting unusually, so she called the medical staff to determine whether the cellmate was under the influence. On October 17, 2018, Sgt. Gamboa learned that Plaintiff's cellmate tested positive for methamphetamine.

Sgt. Gamboa gathered and briefed available officers for a shakedown or search of Echo 3. This included three female officers – Sgt. Gamboa, Officer Terrazas, and Officer Lizet Romero. Officer Romero had to be relieved from other duties for the shakedown. Male officers assisted in the shakedown due to shortages of available female officers. Officer Delgado, a male officer, used

a canine to search Echo 3 for drugs. Sgt. Gamboa told the officers that Cell 20 was the target area and instructed officers to restrain all female detainees before conducting visual searches on the detainees in Cell 20. Female officers were instructed to perform clothing searches of the detainees in Cell 20. Sgt. Gamboa instructed male officers to stay away from the shower area where the visual searches would be conducted.

At the beginning of the shakedown, the female officers entered the Echo 3 dayroom followed by several male officer and announced that male officers were entering the pod. They directed detainees to get on the floor with their hands on their heads.

### B.  Visual Search of Plaintiff.

Plaintiff and her cellmates exited Cell 20 and faced an adjacent wall and were handcuffed. Plaintiff and four other detainees in Cell 20 were visually searched in the shower area of Echo 3 by two female officers, Defendant Gamboa and Defendant Terrazas. The shower area has two separate cinderblock stalls in an L configuration, therefore Defendant Gamboa and Terrazas brought two detainees at a time to the shower area for visual body cavity searches.

During the visual search, Defendants instructed the detainee to remove their clothing and included a visual body cavity search. Defendants also searched the detainees' clothes.

DACDC policy permits a visual search "when there is reasonable suspicion to believe the detainee is in possession of contraband that cannot be detected by a pat search… [when] credible information is learned that the detainee possesses contraband." **Doc. 54 at 5, UMF 14.** "Visual searches shall only be conducted by detention staff who are the same gender as the subject and who have been trained to perform visual searches. When possible, two detention staff of the same gender as the subject will be present during visual searches. No non-essential personnel may witness a visual search." *Id.*, **UMF 15.** "Staff of the same sex as the detainee shall make the

search, except where circumstances are such that delay would constitute an immediate threat to the detainee, staff, others, property, or institutional security." *Id.* **at 6, UMF 16.**

Officers are prohibited by policy from touching detainees during visual searches and officers are required to isolate the detainee pending approval for the search, conduct the search in an area that ensures privacy, and conduct the search tactfully and professionally. DACDC policy further provides that to "obtain a clear view of the rectum/vaginal area, [officers must] have the subject bend over and spread the rectum [, h]ave the subject squat and [] cough 3-5 times then [officers] re-inspect the rectal/vaginal area." **Doc. 54 at 6, UMF 18.**

The shower area is separated from a corridor by a long shower curtain. The shower area has two shower stalls in an L-shaped configuration. One stall faces the shower curtain while the other stall sits perpendicular to the other stall. **Doc. 54-3 at 3-10** (photographs of shower area**).**

The five detainees in cell 20 were escorted two at a time into the shower area. They were put into separate shower stalls during the visual searches. **Doc. 54 at 6 UMF 20.**

Plaintiff presents an affidavit from the other detainee searched, Ms. Velazquez. Ms. Velazquez states that the two were placed in the same area or stall. **Doc. 63-1 at 13.** As explained below, viewing the lapel camera footage **(Doc. 54-4, Attachment 2)** and the photographs **(Doc. 54-3 at 3-10)** the Court concludes that no reasonable jury could conclude that Plaintiff and Ms. Velazquez were placed in the same stall. The lapel camera reflects that both Sgt. Gamboa and Officer Terrazas were standing in the shower area between the stalls. The stalls are approximately 36 to 40 inches wide. It was not possible for all four to be in the shower common area, especially if the inmates were sitting down as asserted by Ms. Velazquez. Defendants asserted, through affidavits, that Ms. Velazquez and Plaintiff were placed in separate stalls, and they sat on the floor facing the back wall, away from the other detainee. **Doc. 54-12 at 2; Doc. 54-3 at 2.** However, a

reasonable jury could conclude that, depending on where Ms. Velazquez and Plaintiff were standing or sitting in their respective stalls, Ms. Velazquez and Plaintiff could potentially see each other.  **Doc. 63-1 ¶ 15, 16.**

Plaintiff asserts that she and Ms. Velazquez were "forced" to face each other, but this is unsupported in the record.  *See* **Doc. 63-1 at 2** ("I was able to see Susan remove her tampon in front of me.").

Plaintiff asserts she was forced to cough thirteen times during the visual body cavity search.  **AMF L.**  To support this assertion, she cites a report in which "inmate Hylton then stated that she was asked to cough and squat about 13 times."  **Doc. 54-4 at 3.**  Defendants objected that this is hearsay, as Plaintiff is citing her out of court statement in report taken by Lt. Lujan.  Plaintiff has not established how her statement to Lt. Lujan in the report is admissible.  Therefore, Plaintiff's factual assertion under Doc. 73, AMF L is not supported by admissible evidence.

Alternatively, the Court notes that Officer Delgado's lapel camera only shows three coughs.  Thirteen coughs were not heard.  Defendant Gamboa asserts she only coughed three times.  Therefore, no reasonable jury could conclude that she was forced to cough 13 times.

Sgt. Gamboa performed Plaintiff' visual search in the shower stall that faces the shower curtain.  Sgt. Gamboa told Plaintiff to take off her clothes and instructed her to hand each item of clothing for inspection.  Plaintiff told Sgt. Gamboa she was wearing a homemade tampon, and Sgt. Gamboa told Plaintiff to take the tampon out and leave it on the floor.  Sgt. Gamboa denied Plaintiff's request to throw it out because pursuant to DACDC policy she had to inspect it for contraband.  *See* **Doc. 54 at 7.**  Sgt. Gamboa then conducted a visual body cavity search of Plaintiff.  She instructed Plaintiff to turn, bend over, squat, and then cough three times. At times detainees will fake cough.  Under these circumstances officers require detainees to cough again.

Plaintiff asked for a new tampon. Sgt. Gamboa asked if another was available in Echo 3. Because the shakedown was ongoing and she had more visuals to be done, she did not want to leave Echo 3 and create a risk for contraband to be destroyed. **Doc. 54-3 at 2.**

The shower curtain left a small gap between the wall and the curtain. The lapel camera shows that during the visual searches, Officer Terrazas held one side of the curtain taut to the wall while Sgt. Gamboa stood in front of the gap on the other side. **Doc. 54 at 21; 54-4 Attachment 2 (lapel video) at 5:22, 7:55-8:10.** The lapel camera video showed there was no "tear" in the shower curtain and the curtain was not hanging far away from the wall as Plaintiff claims. *See, e.g.,* **AMF Q.** Officer Delgado had his lapel camera on while searching the cells for contraband with a canine. In reviewing the lapel camera footage, the Court sees no indication that Plaintiff could be seen through any gap. The shower stall is narrower than the shower common area and Sgt. Gamboa was standing in front of the gap. Generally, only Sgt. Gamboa, the wall, or Plaintiff's clothes on the shelf can be seen through the gap between the shower curtain and wall. *See* **Doc. 54-4, Attachment 2 (lapel camera footage) at 5:37, 7:37-39, 8:03.** Therefore, the Court concludes that no reasonable jury could find that male officers could see Plaintiff during the visual search.

Ms. Velazquez was then visually searched in a separate stall. Defendants did not find contraband on Plaintiff. At the end of Plaintiff and Ms. Velazquez's visual search, Plaintiff was asked whether she knew if anyone was using drugs. She denied using drugs but admits that one of her cellmates was "all fucked up, all night" and going "crazy", and that the drugs left her cell the night before. **Doc. 54 at 8 ¶ 32.**

Defendants knew Plaintiff had a history of drug use at the DACDC facility. **Doc. 54 at 8 ¶ 33,** *citing* **Doc. 54-3 ¶ 14 (Gamboa affidavit), and Doc. 54-12 at ¶9 (Terrazas affidavit).**

7

Plaintiff disputes this asserted fact but provides no citation to the record. Fed. R. Civ. P. 56(c)(3). Detainee Priscilla Giron, Plaintiff's cellmate, indicated it was likely she would test positive.

Male officers provided affidavits providing that they did not see Plaintiff or any detainee in the shower area during their visual searches.

**DISCUSSION**

Defendants assert they are entitled to qualified immunity as to Count I. The Court, in its discretion, addresses only the second prong of qualified immunity and concludes that Plaintiff has not shown that the law was clearly established as to the particular conduct in this case. *See, e.g., Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir.) (addressing clearly established prong of qualified immunity only), *cert. denied sub nom. Cummings v. Bussey*, 140 S. Ct. 81, 205 L. Ed. 2d 27 (2019). Plaintiff argues that general statements of law are sufficient to show a violation of clearly established law in this case. The Court disagrees concludes that any constitutional violation was not "overtly clear."

**I.     Fourth Amendment Unreasonable Search.**

Plaintiff alleges that Defendants unreasonable searched her. Although Plaintiff pled Fourth, Eighth, or Fourteenth Amendment claims under Count I, the parties now appear to agree that Plaintiff's unreasonable search claim should be analyzed under the Fourth and Fourteenth Amendments. *See* **Doc. 73 at 17.** The Court will therefore do the same.

Under the Fourth Amendment, detainees have a right not to be subjected to a "strip search in full view of several (or perhaps many) others unless the procedure is reasonably related to a legitimate penological interest." *Farmer v. Perrill*, 288 F.3d 1254, 1260 (10th Cir. 2002) (emphasis omitted). In reviewing such searches, courts consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is

8

conducted." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). However, prison officials must "be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id*. at 547, 99 S.Ct. 1861. Prison officials are not required to use the least restrictive alternative. *Farmer v. Perrill*, 288 F.3d at 1260.

Similarly, under the Fourteenth Amendment the Court considers whether the Defendants' conduct was rationally related to a legitimate government objective and was not excessive in relations to that purpose. *Colbruno v. Kessler*, 928 F.3d 1155, 1164 (10th Cir. 2019), *citing Kingsley*, 135 S. Ct. at 2473–74.

## II.     Qualified Immunity Standard.

Defendants Gamboa and Terrazas have asserted the defense of qualified immunity, which shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Romero v. Story*, 672 F.3d 880 (10th Cir. 2012).

When a defendant moves for summary judgment on the basis of qualified immunity, the plaintiff bears a heavy two-fold burden. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must put forward evidence showing (1) that the defendant violated plaintiff's constitutional rights, and (2) the right at issue was clearly established at the time of the violation. *Id*. If the plaintiff fails to establish either part of the two-part inquiry, the court must grant the defendant qualified immunity. *Id.*

For a violation to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found

the law to be as the plaintiff maintains." *Mocek v. City of Albuquerque*, 813 F.3d 912, 922 (10th Cir. 2015) (quoting *Morris v. Noe,* 672 F.3d 1185, 1196 (10th Cir.2012)). A case need not be directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, ––– U.S. ––––, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs,* 475 U.S. 335 (1986)).

### III.   Defendants clearly had reasonable suspicion to initiate a visual body cavity search.

Initially, the Court notes that Defendants clearly had reasonable suspicion to visually search Plaintiff. *Hinkle v. Beckham Cty. Bd. of Cty. Commissioners*, 962 F.3d 1204, 1238 (10th Cir. 2020) (reasonable suspicion required to strip search detainee), *citing Archuleta v. Wagner*, 523 F.3d 1278, 1285 (10th Cir. 2008) ("[W]hether a strip search is permissible is a separate inquiry based on whether a detainee will be placed in the general prison population and whether the officer has reasonable suspicion that a detainee has hidden drugs, contraband, or weapons."); *see also Bell v. Wolfish*, 441 U.S. 520, 560, 99 S. Ct. 1861, 1885, 60 L. Ed. 2d 447 (1979) (probable cause not required for body cavity search of detainee). The undisputed facts above show that (1) Defendants received a report from a detainee that detainees from Plaintiff's cell, Cell 20, were snorting a white powdery substance; (2) Lt. Renteria observed that Plaintiff's cellmate was acting unusually and called for medical attention and drug testing; (3) Plaintiff's cellmate tested positive for methamphetamine; and (4) Defendants knew that Plaintiff had a prior history of drug use in the facility. Taken together, these facts known to Defendants provide clear reasonable suspicion that Plaintiff possessed drugs or contraband justifying a visual body cavity search.

Therefore, Defendants had clear reasonable suspicion to conduct a visual body cavity search for possible contraband of the five detainees housed in Cell 20, including Plaintiff. Plaintiff

has not shown there was a violation of clearly established law in initiating the visual body cavity search.

## IV. Manner in which search was conducted did not violate clearly established law.

The primary issue in this case is whether the manner the visual body cavity search was carried out was reasonable. Under the Fourth Amendment, the Court considers the reasonableness of the particular visual search by balancing the needs of the search against the invasion of privacy considering the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *Bell*, 441 U.S. at 559. Under the Fourteenth Amendment the Court considers whether the actions were rationally related to a legitimate government objective and was not excessive in relations to that purpose. *Colbruno v. Kessler*, 928 F.3d 1155, 1164 (10th Cir. 2019), *citing Kingsley*, 135 S. Ct. at 2473–74.

The Fourth Amendment does not require "complete privacy" if there is a legitimate penological interest in manner in which the search is conducted. *Daughtery v. Harris*, 476 F.2d 292, 294 (10th Cir. 1973), *cited in Bell v. Wolfish*, 441 U.S. 520, 560, 99 S. Ct. 1861, 1885, 60 L. Ed. 2d 447 (1979).

### A. Relevant Facts for Clearly Established prong.

The Court generally considers Plaintiff's version of the facts that find support in the record. *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018). The Court also considers the facts Plaintiff admits. However, if facts are "blatantly contradicted by the record, so that no reasonable jury could believe it," then the Court "should not adopt that version of the facts." *Thomson*, 584 F.3d at 1312 (quotation omitted), *quoted in Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018); *Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is

11

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

The Court reviewed the cited record, including the lapel camera footage from Officer Delgado, who searched the cells across from the shower area with a canine. **Doc. 54-4, Attachment 2 (Lapel video from Officer Delgado).** The Court also reviewed the photographs of the shower area. **Doc. 54-3.** Plaintiff primarily bases the Fourth and Fourteenth Amendment violations on two asserted facts: (1) male officers could see her during the body cavity search when walking by the shower area and (2) she was placed in the same stall as Ms. Velazquez, and the two detainees could see each other during their visual strip searches.

Here, the facts that are well supported in the record show that the visual body cavity searches occurred in a shower area with two stalls. There were five detainees in Cell 20 who were visually searched. They were searched two at a time, one for each stall. The two stalls were in an L-configuration with an area between the stalls. Defendants stood in the area between the shower stalls. There is one shower curtain separating the shower area from the rest of the Echo 3 pod. The lapel video showed that Officer Terrazas held one side of the curtain taut to the wall, while Defendant Gamboa stood near the gap on the other side. **Doc. 54-4, Attachment 2 at 5:37, 7:37; and 8:03.**

There is a gap between the bottom of the shower curtain and the ground. Plaintiff speculates that male officers could have seen her tampon on the ground of the shower stall. Based on the lapel video, no tampons were viewable on the ground.

Plaintiff asserts that Defendants forced her to cough thirteen times during the visual body cavity search to humiliate her. As noted above in the Undisputed Fact section, this fact as not supported by admissible evidence. Alternatively, the lapel camera of Officer Delgado, who was

searching the cells directly across from the shower area, only catches three coughs, consistent with Sgt. Gamboa's affidavit. **UMF 22, Doc. 54-4, Attachment 2, 5:10-5:22.** Therefore, the Court finds that no reasonable jury could not conclude that Defendants forced her to unnecessarily cough thirteen times to intentionally humiliate her.

Plaintiff asserts that the shower curtain was torn at the top such as that it hung away from the wall. The lapel video during the shakedown does not reflect that the shower curtain was torn, and the picture of the curtain does not show any tear. Therefore, the Court finds no reasonable jury could find that the shower curtain was torn and falling away from the wall.

Plaintiff argues that there was a gap in the curtain and a male officer passing by *could have* seen her during the visual body cavity search. However, the lapel video shows that this speculative concern was not possible. The lapel video shows that one female officer was holding one side of the curtain taut to the wall, while Sgt. Gamboa was standing to block the small gap on the other side. Based on the lapel video, a passing officer could only have seen (1) the wall; (2) Sgt. Gamboa, and (3) Plaintiff's clothes placed on a shelf on the shower wall. The shower curtain and the Defendants (who stood in the shower area between the curtain the Plaintiff) prevented male officers from seeing Plaintiff during the visual body cavity search. Based on the lapel video, the Court believes that no reasonable jury could believe that Plaintiff was viewable through any gap between the curtain and wall. As explained below, even if a male officer could have seen her through a gap between the wall and the curtain, the Court finds that the steps taken to protect Plaintiff's privacy were reasonable and any violation would not have been apparent to a reasonable officer.

Plaintiff also asserts that a male officer admitted he could see her. To support this factual assertion, she cites to Officer Delgado's statement in the record. The record does not reflect any such admission. Therefore, the Court disregards this factual assertion as unsupported in the record.

Plaintiff submitted an affidavit from Ms. Velazquez, the detainee searched in the other shower stall. Ms. Velazquez stated she and Plaintiff were placed in the same shower stall two feet apart. The shower area had two stalls in an L configuration. No reasonable jury could believe that they were placed in the same stall. Each shower stall is approximately 36 to 40 inches wide. If two feet were between them, the two detainees would have to fit into a total of approximately 1 foot. This is physical impossible. Plaintiff needed space to bend over for the search, while Sgt. Gamboa needed a clear view of Plaintiff during the search. The lapel video shows that the officers were standing in the common shower area between the stalls. Defendants clearly brought in two detainees to the shower area because there were two shower stalls. Therefore, a reasonable jury would conclude that Ms. Velazquez and Plaintiff were placed in separate shower stalls.

The full cinder block wall between the stalls provides substantial privacy. The lapel camera footage shows that Defendants Gamboa and Terrazas were standing in the area between the stalls, potentially blocking the view of Ms. Velazquez. However, a reasonable jury could find that Ms. Velazquez could see Plaintiff during the visual body cavity search, depending on where they were positioned in their respective shower stalls.

Therefore, a reasonable jury could conclude that (1) male officers could not see Plaintiff through the shower curtain during the visual body cavity search, and (2) Plaintiff and Ms. Velazquez were not placed in the same shower stall, but they could potentially see each other depending on where they stood or sat in their respective shower stalls.

**B.    Plaintiff failed to carry her burden under the clearly established prong.**

Plaintiff bears the burden of showing that it was clearly established to a reasonable officer that the particular conduct violated her constitutional rights. To do so, Plaintiff may:

- cite to binding precedent with facts similar to the particular conduct at issue. *See, e.g., A.M. v. Holmes*, 830 F.3d 1123, 1154 (10th Cir. 2016) (granting qualified immunity where "neither of Plaintiff's cited sources can serve as the clearly established law governing this First Amendment retaliation claim.").;

- cite to the clear weight of non-binding authority that would show the particular conduct in this case is unlawful; or

- show that general statements of law would make it obviously clear to a reasonable officer that the conduct was unlawful.

Initially, the Court notes that Plaintiff has not identified any factually similar cases that would alert reasonable officers that the particular conduct violated the constitution. This is often fatal to a qualified immunity claim. Plaintiff does not attempt to compare the facts of this case to other Tenth Circuit or United States Supreme Court cases. Plaintiff cites generally to some cases, but none of these provide clearly established law relevant to the particular conduct in this case.

The cases cited by Plaintiff for clearly established law are not on point, because they concluded (1) there was no reasonable suspicion to search the detainee to begin with, which is not relevant here or (2) the defendants did not take the reasonable steps taken here to protect the plaintiff's privacy. Plaintiff cites to *Colbruno v. Kessler*, 928 F.3d 1155, 1165 (10th Cir. 2019)*,* in which the plaintiff soiled his clothes and was marched naked down a hallway for medical treatment. The asserted penological interest, quickly giving him medical care, was belied by the fact that it took two hours to give him medical care. That case is obviously not factually similar to this one.

Plaintiff also cites to *Bell v. Wolfish*, 441 U.S. 520 (1979). *Bell v. Wolfish* generally addressed whether body cavity searches were allowed *at all*, and the Supreme Court concluded that the "searches must be conducted in a reasonable manner. But we deal here with the question

15

whether visual body-cavity inspections as contemplated by the MCC rules can *ever* be conducted on less than probable cause. Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, we conclude that they can." *Bell v. Wolfish*, 441 U.S. 520, 560, 99 S. Ct. 1861, 1885, 60 L. Ed. 2d 447 (1979).

Plaintiff also cites to *Hayes v. Marriot*, 70 F.3d 1144, 1145-46 (10th Cir. 1995). In that case, a visual search was conducted in the open in front of 100 people, including people of the opposite gender. That is nothing like this case at all. The Court has not found any other Tenth Circuit case factually on point. *See, e.g., Hill v. Bogans*, 735 F.2d 391, 394–95 (10th Cir. 1984) (defendant conducted strip search in room with ten to twelve people. There was no reasonable suspicion as strip search was routine and plaintiff was only detained for minor traffic offenses).

Plaintiff also cites to several non-binding cases. The Court assumes Plaintiff cites to these cases to establish the "clear weight" of non-binding authority. *Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018), *quoted in Brown v. Flowers*, 974 F.3d 1178, 1184 (10th Cir. 2020). However, the cases cited by Plaintiff are also not factually on point and would not give notice to a reasonable officer in this case that her conduct was unlawful. Rather, out of circuit cases are not at all clear on this issue, as some provide that strip searches can be conducted in small groups for efficiency. *See, e.g., Williams v. City of Cleveland*, 907 F.3d 924, 936 (6th Cir. 2018) ("Indeed, processing detainees in groups of two or three during high-volume hours would presumptively speed up the intake process. We find that the City's policy of allowing strip searches to be conducted in groups of two or three during busy periods, such as Williams's time of intake, was reasonably related to the City's legitimate penological interest of expediting the intake procedure."); *See also, Story v. Foote*, 782 F.3d 968, 972 (8th Cir. 2015) ("We therefore conclude that the alleged presence of other inmates during Story's search does not state a claim for the

violation of clearly established rights."). Therefore the "clear weight" of out of circuit precedent would not indicate that the particular conduct in this case was unconstitutional.

Plaintiff cites to general statements of law and apparently relies on the "obvious clarity" doctrine. "The law is also clearly established if the conduct is so obviously improper that any reasonable officer would know it was illegal." *Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1027 (10th Cir. 2015). In other words, "when a public official's conduct is so egregious [that] even a general precedent applies with 'obvious clarity,' the right can be clearly established notwithstanding the absence of binding authority involving materially similar facts." *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020). Courts, however, must not use the "obvious clarity" doctrine "when there are any relevant ambiguities...." *Colbruno v. Kessler*, 928 F.3d 1155, 1165 (10th Cir. 2019). " '[T]he obvious clarity' scenario, is a 'narrow exception' to the 'normal rule that only case law and specific factual scenarios can clearly establish a violation.' " *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1260 (11th Cir. 2018) (citation omitted).

Here, any unlawfulness would not have been obviously clear to a reasonable officer given the reasonable precautions taken to ensure Plaintiff's privacy. *See, e.g., Peoples v. Baker*, 795 F. App'x 610, 612–13 (10th Cir. 2020) ("Although Peoples complains that the bathroom was visible to a classroom across the hall, photographic evidence shows that any such view would have been severely obstructed (particularly with two officers standing in the doorway"). Defendants placed Plaintiff and Ms. Velazquez in separate shower stalls and stood in the area between them. This would be reasonably sufficient to protect Plaintiff's privacy, even if it turned out that Ms. Velazquez and Plaintiff could in fact see each other during the visual searches. Sgt. Gamboa instructed male officers to stay away from the shower area. Moreover, Defendant Terrazas held

the shower curtain closed on one side while Defendant Gamboa stood in front of the small gap on the other side. The record does not reflect that male officers could see Plaintiff, and even if they did, Defendants took reasonable steps to prevent that from happening.

Plaintiff appears to argue that Defendants should not have used both shower stalls. She asserts they instead should have searched the five detainees one by one. There were legitimate penological interests in using both shower stalls outweighing Plaintiff's need for privacy. The visual searches occurred during a "shakedown" of the Echo 3 pod in light of a detainee's reports of drug use, and a positive test for methamphetamine. The undisputed facts show that they were short on female officers, while DACDC regulations provided that two female officers needed to observe the visual search, which was a reasonable precaution. For efficiency and to ensure contraband was not destroyed, it was a reasonable penological interest to utilize both shower stalls and place one detainee in each shower stall.

Because of the limited number of female officers, the need to efficiently complete the shakedown, and the desire to ensure contraband was not destroyed or hidden, it was reasonable to use both shower stalls, which would reasonably protect detainee privacy. Searching for and confiscating contraband is a serious penological interest to protect the safety of the detainees. Detention facilities are "fraught with serious security dangers," *Wolfish,* 441 U.S. at 559, 99 S.Ct. 1861, and correctional institutions have a strong interest in preventing and deterring the smuggling of money, drugs, weapons, and other contraband. *Florence,* 132 S.Ct. at 1516–17; *Wolfish,* 441 U.S. at 559, 99 S.Ct. 1861. "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Wolfish,* 441 U.S. at 546, 99 S.Ct. 1861.

Plaintiff also argues that Defendants forced her to place her tampon on the ground of the shower stall, and not throw it away, to intentionally humiliate her. However, as explained by Defendants, this was reasonably related to a rational governmental purpose because they had to search the tampon for contraband.

Therefore, even assuming Ms. Velazquez could potentially see Plaintiff during the strip search, the Court finds that there is no violation of clearly established law under the Fourth Amendment in light of the reasonable steps taken by Defendants to protect Plaintiff's privacy and the penological interests weighing in favor of this search. For the same reasons as above, there was no violation of the Fourteenth Amendment. There was no indication Defendants intended to punish Plaintiff, because the search was rationally related to a legitimate governmental interest.

## CONCLUSION

For the reasons stated above, Defendants Gamboa and Terrazas are entitled to qualified immunity as to the claims under Count I.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment on the basis of qualified immunity **(Doc. 54)** is **GRANTED**.

_____
**KEA W. RIGGS
UNITED STATES DISTRICT JUDGE**